BRUNOT, J.
 

 The appellants were indicted and tried for the crime of murder. Both were convicted of the crime of manslaughter, and each was sentenced to serve a term, at hard labor, in the Louisiana State Penitentiary, for not less than three nor more than five years. Erom the verdict and sentence both appealed.
 

 During the course of the trial four bills of exceptions were reserved and were perfected timely.
 

 Bill No. 1.
 

 This bill was reserved to the overruling of the defendants’ objection to the district attorney testifying as a witness in the case. The bill recites that, “after the state’s evidence had been closed, the district attorney took the stand and .over the objection of counsel for defendants * * * was permitted to testify as shown by the annexed testimony of said district attorney attached and made part of this bill.”
 

 The record discloses that the district attorney was sworn and testified as a witness prior to the closing of the state's case, in chief, and not after the state’s evidence had been closed. The district attorney had requested the brother of the deceased to ascertain for; him the names of the persons who witnessed the homicide and the facts attending the homicide. It was developed on the cross-examination of the state witness that defendants sought to prejudice the state’s case by reason of the admitted activity of the brother of the deceased in obtaining the names and the respective versions of the witnesses of the homicide. In explanation of the activity of the witness, the ’ district attorney took the stand and testified-as follows:
 

 “I want to state to the court and the jury that I advised Cleveland Rachal, the brother of the man alleged to have been killed, to ascertain the names of parties who were present at the home of Joe Ebert on the night of the alleged homicide and to learn from them anything that they might know of the alleged homicide and to report such names to me.” (Trans, p. 26.)
 

 The foregoing quotation is all of the district attorney’s testimony, in chief. The witness does not express an opinion; what he said has no bearing upon the guilt or innocence .of the accused; and it was merely a proper and called for explanation by a prosecuting officer engaged in the conscientious performance of a solemn duty. As to the relevancy of the testimony, see State v. Parker, 7 La. Ann. 83, 84; State v. Conner, 7 La. Ann. 379.
 

 Bill No. 2.
 

 This bill was reserved to a statement made by the district attorney during his closing argument. It appears fr.om the record
 
 *393
 
 and the per curiam of the trial judge that the statement complained of was made in reply to the argument of one of the counsel for the accused. Counsel, in his argument, stated to the jury the facts which one of the accused would have testified to, on cross-examination, if he had not been prevented from doing so upon the objection of his own counsel. The judge’s per curiam, in our opinion, disposes of this bill. It is as follows:
 

 “Mr. W. Peyton Cunningham, one of the counsel for the defendant Eredieu in argument to the jury stated to them in substance that Eredieu had been asked on cross-examination why he went out of the house. That the question was objected to and sustained because the state was not permitted to cross-examine a defendant except upon matters brought out in examination in chief, but if he had been permitted to do so he would have told them (the jury) that he went out of the house as a peacemaker. The district attorney in his closing argument stated to the jury that Mr. Cunningham had told them that if Eredieu had been permitted to answer as to his reason for going outside the house, where the deceased was, he would have answered that he went out as a peacemaker. In answer to such statement by counsel the district attorney further stated that the defendant had not so testified and that he did not know 'what his testimony would have been because of a rule as stated by Mr. Cunningham, he was not permitted to ask this defendant any question relative thereto. At this point, Judge Cunningham one of the counsel for defense asked that a bill of exception be noted to the district attorney discussing a matter prejudicial to the defendant. The statements made by the district attorney were entirely in answer to the argument of Mr. Peyton Cunningham, who had stated to the jury, what the defendant would have testified, if he had not been prevented from doing so by objection of his own counsel. The district attorney did state that he would continue such argument until the court stopped him. However, he made no further comment. No request was made that he be stopped and no request was made that I give the jury any instructions. I did not interfere because it was purely an answer to the remarks of Mr. Peyton Cunningham.”
 

 In the ease of State v. Morgan, 145 La. 585, 82 So. 711, and State v. Satcher, 124 La. 1015, 50 So. 835, it is held that:
 

 “A remark by the prosecuting officer in his closing argument, as a necessary or proper, answer to what has been said in the argument of defendant’s counsel, though otherwise improper, affords no grounds for setting aside a conviction.”
 

 Bill No. 3.
 

 This bill was reserved to a ruling of the court, excluding, as evidence, a certificate of the clerk of court of Grant parish, showing the conviction and sentence of the state’s chief witness for numerous offenses committed by said witness in that parish. On cross-examination of this witness he specifically admitted all and each of the charges, convictions, and sentences shown in the certificate. Whether the certificate was or was not properly certified is not material. The trial judge did not exclude it for that reason, but did so because the witness admitted every fact contained in the certificate. The ruling was fundamentally correct.
 

 When a fact is admitted, the question of its existence vel non no longer exists, and that question cannot, therefore, be referred to the jury. State v. Kellog, 104 La. 580, 29 So. 285.
 

 Bill No. 4.
 

 This bill was reserved to the overruling of separate motions for a new trial filed by each of the codefendants. The allegations of both motions are similar in all respects except one. In addition to the stereotyped objection, that the verdict is contrary-to the
 
 *395
 
 law and the evidence, both motions amplify that objection by alleging that the state failed to prove a motive for the crime or that defendants conspired to commit it. Both motions also allege racial prejudice, newly discovered evidence, and that the district attorney, during the course of his argument to the jury, commented upon the finding of a pocket knife upon the person of the deceased after the homicide in a manner prejudicial to the rights of the defendants. In the motion filed by Edward Fredieu, Sr., it is additionally alleged that J. E. Brett, one ,of the jurors who tried the case, disregarded the solemn duty imposed upon him as a juror in a manner which “amounted to a deprivation of justice, and prevented mover from having a fair trial before an impartial jury of his peers.” The recitals of the motion in this connection are as follows:
 

 “That after the trial of the cause, said juror in conversation with Jas. J. Copellar and E. O. Payne, prominent citizens of this parish, made the following statements: ‘Yes, we convicted Elias and Fredieu of manslaughter. I served on the petty jury panel the whole week. We convicted in every case that came up during the week except one. You know I told all these lawyers around here that if they took me on the jury I was going to convict every time.’ That said juror also made the following statement to said Copellar and Payne: T do not like all that talking and speechmaking the lawyers perform. I told the district attorney that when I dropped my finger like this’ (pointing downward with his finger) ‘that he should stop talking that we had enough of that talking.’ ”
 

 The testimony of the witnesses named, of the juror, and of the district attorney, was taken down and attached to the bill. From this testimony it appears that Juror Brett did tell Copellar and Payne that the jury had convicted every case upon which he had sat as a juror during the week, and that he had told one lawyer that he would convict if taken on any case. The testimony of the juror and of the district attorney is to the effect that when the juror was tired to hold his finger down and the district attorney would stop talking. It is shown that these remarks were made in a jocular manner during the week the jury was serving. There is no evidence that they were made during the trial of this case, and counsel for defendants, in their argument, paid high tribute to both the district attorney and the juror. While it is apparent, from the facts as disclosed, that the remarks complained of were made in a jocular vein and had no connection with the verdict rendered in this case, nevertheless, we cannot refrain from commenting upon the impropriety of them, as being ill-timed and out of place. If the testimony attached to the bill did not convince us that Juror Brett fully realized the importance and solemnity of his oath as a juror, and, for that reason, may not have faithfully and impartially discharged his duty as a juror, we would unhesitatingly set the verdict aside and remand the case for a trial according to law. We have examined the record in this case very carefully and feel convinced that the trial judge’s per curiam correctly disposes of this bill. We quote the per curiam in full:
 

 “So far as the application for a new trial is based upon an allegation that the verdict was contrary to the law and the evidence I overruled the same because I was of the opinion that the defendants had had a fair and impartial trial, and that the verdict rendered by the jury was fully justified by the evidence.
 

 “I cannot state what the jury determined to be the motive of the defendant. The evidence shows that the deceased, the defendants and a number of other parties were attending a dance. Some difficulty had arisen in the house and the deceased left the house in the company of one, Albert DeSoto. After
 
 *397
 
 he
 
 and
 
 DeS
 
 oto
 
 had
 
 gotten some
 
 fifteen
 
 or
 
 twenty steps from the house the defendant followed them out and Eredieu hollered at him, using some curse word, and ashed him "What the hell you mean.’ The defendant, Aniee Elias and the deceased applied together a very vile epithet. Whereupon the deceased stated that he would whip them all if they came to him one at a time. Elias went up to where the deceased was and was struck by the deceased. Elias then went around the crowd, that had assembled in the meantime some several yards away from deceased and stated to the deceased that T am a good mind to shoot you.’ At this point, Eredieu the other defendant according to the witnesses for the state, said to Elias ‘Shoot him, shoot him,’ and shoved some person from between Elias and the deceased. On being urged by defendant Eredieu to shoot, he did so. The using of the vile epithet of deceased to Elias and the striking of Elias by the deceased I take it, was the motive for firing the fatal shot.
 

 “I overruled the motion for a new trial on the ground of prejudice for the reason that I did not know of, nor have I ever heard of any intimation or suggestion of the prejudice existing against defendants’ nationality until the filing of this motion. I gave the defendant and their counsel every opportunity to show if they could, the existence of any prejudice which they refused to avail themselves of.
 

 “I do not recall just what portion of the district attorney’s argument the bill of exception refers to; but no objection was made to the argument with reference to the knife and no exception was taken thereto.
 

 • “I overruled the application for a new trial in so far as the same refers to newly discovered evidence that would .be given by E. P. Bullitt and J. N. Eletcher, in which it is stated that on the day after the homicide they saw .one Thomasee a half brother of the deceased with the knife
 
 and who
 
 stated ‘that was the knife that Henry Rachal had when he was shot,’ for the reason that this testimony was purely cumulative. Several witnesses for the defendant testified that immediately after deceased was shot, on the outside of the house, he staggered in the house holding in his ‘open hands’ an open knife. This testimony which was sought to be proved by the said Bullitt could not possibly have changed the verdict of the jury. Besides most of the statement is hearsay, and the
 
 only
 
 portion of it that
 
 would
 
 have been admissible was that these two witnesses saw the brother-in-law of the deceased on Sunday with a knife that had blood on it.
 

 “I overruled the application for a new trial made on the alleged grounds of newly discovered evidence that would be given by Peter Garter for the reason that, such evidence would have been impeachment evidence pure and simple.
 

 “I overruled the application for a new trial on the allegation that the juror J. E. Brett was incompetent and prejudiced for the following reason: I had known this juror well for fifteen years, I knew him to be a good man and a splendid citizen and one who stood exceptionally well in the town of Natchitoches and vicinity. This juror has served in that capacity on numerous occasions, during the time I have been district judge and while I occupied the position of district attorney of this district. I knew him to be fair and impartial and that he fully realized the solemnity of jury service. I knew that there was no significance in the remarks he had made to the witnesses and that they were not made seriously. In overruling this motion I was cited to and had under consideration the ruling of the Supreme Court in case of State v. Walls et al., 52 La. Ann. 1002, 27 So. 537. However knowing this juror as I did, and as stated above, I felt that to sustain the application on the grounds of this remark of the
 
 *399
 
 juror would be nothing short of a miscarriage of justice.
 

 “This was the last case to be tried during that week of court. The lawyers in this case, all knew Mr. Brett well, they knew how many defendants had been convicted and how many had been acquitted. They knew that Mr. Brett had served on most of these juries and they knew that he had been foreman of the petit jury in at least two of these eases. Knowing these facts notwithstanding they were entitled under the law to twenty-four peremptory challenges, they exhausted but four of such challenges. I did not have the slightest doubt but that this juror fully realized the importance and the solemnity of the service imposed on him as a juror in this case and other cases; but if I had entertained any doubt whatever, I would have unhesitatingly set the verdict aside.”
 

 For the reasons stated and upon the authority of State v. James, 165 La. 822, 116 So. 199, the verdict and sentence are affirmed.